Clare E. WALDEN, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 90–230C.

United States Claims Court.

Nov. 22, 1991.

Kenneth M. Carpenter, Topeka, Kan., for plaintiff.

James M. Kinsella, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Lt. Col. W. Gary Jewell and Capt. W. Renn Gade, Office of the Judge Advocate General, Department of the Army, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on renewed cross-motions for summary judgment following an earlier remand. *Walden v. United States*, 22 Cl.Ct. 532 (1991). The issue is whether a military review board, by awarding plaintiff 30-percent disability retirement, wrongfully denied plaintiff entitlement to full disability for Post-traumatic Stress Disorder from which he indisputably suffers.

## FACTS

The following facts derive from the administrative record. For the convenience of the parties and the reader, the facts reported at 22 Cl.Ct. at 533–37, which the parties adopt in the post-remand proceedings, are reprinted in full.

Clare E. Walden ("plaintiff") enlisted in the United States Army (the "Army") on January 26, 1968. His service terminated on March 17, 1971, with an Undesirable Discharge, which subsequently was upgraded to an Honorable Discharge by virtue of his decoration for valorous service in the Republic of Vietnam.

Plaintiff served honorably and meritoriously in Vietnam from September 9, 1968

through January 7, 1969, a period of approximately four months.[1] Upon arrival in Vietnam, plaintiff took part in heavy combat and consequently received two individual decorations, one of which was for valor.

On January 14, 1969, plaintiff received Article 15 punishment for an episode of being absent without leave ("AWOL") and for being drunk in command. On January 29, 1969, during a period of hospitalization for a lacerated hand, plaintiff was given a psychiatric consultation and was diagnosed with "chronic mild depression with suicidal ideas under combat conditions." Found "actively suicidal" when surrounded by death and killing, plaintiff was restricted from combat duty; however, the psychiatric department judged plaintiff to be medically fit to return to duty, as restricted.

Once stateside, plaintiff was repeatedly AWOL from his unit from March 1969 through March 1970, a total of 388 days. After two AWOL convictions, plaintiff was charged on December 10, 1970, with being AWOL for two additional lengthy absences in 1970, both of which spanned 60 days' duration. During his stateside service, plaintiff received treatment in August 1969 for a head injury. Within 30 days thereafter, plaintiff complained of disorientation, but upon separate examination "no residuals were shown." In November 1969 plaintiff was hospitalized for "[d]epressive reaction ... manifested by anxiety, depression, and suicide ideation." During his confinement in the stockade at Fort Riley, Kansas, for AWOL charges, plaintiff was noted to have "depressive reaction." Plaintiff's Army records reveal a pre-service history of psychiatric illness.

On January 15, 1971, plaintiff requested "discharge for the good of the service" in lieu of trial by court martial. Plaintiff's petition acknowledged that approval of his request might result in discharge under other than honorable conditions and receipt of an Undesirable Discharge Certificate.

After a separation physical examination on January 25, 1971, plaintiff was found fit

---

1. Records of the Veterans Administration reflect that plaintiff was evacuated after five and one-

half months.

for continued duty. When asked to state his present health in his own words, plaintiff stated, "I am in good health." However, the medical report indicates that plaintiff had experienced "depression or excessive worry," had suffered a head injury, and had attempted suicide. The Request for Discharge received approval on March 10, 1971, and the Undesirable Discharge issued the following week. On a form plaintiff signed, captioned "Statement of Medical Condition," dated March 17, 1971, he checked the box next to the line reciting: "There has been no change in my medical condition." This notation referred to his January medical examination.

Implementing President Nixon's September 16, 1974 Presidential Proclamation 4313, President Ford on January 19, 1977, ordered the upgrade of discharge for veterans who received declarations for valor in Vietnam. On February 18, 1977, the Army Discharge Review Board determined that plaintiff was properly, "but not equitably," discharged and concluded that he should receive a discharge under Honorable Conditions.

In 1979 Plaintiff initially filed a claim with the Veterans Administration (the "VA") for disability benefits concerning injuries alleged to have occurred during his service pursuant to 38 U.S.C. § 331 (1982), which provides, in pertinent part:

> For disability resulting from personal injury suffered ... in the line of duty ... during other than a period of war, the United States will pay to any veteran thus disabled and who was discharged or released under conditions other than dishonorable from the period of service in which said injury ... was incurred, ... compensation as provided in this subchapter....

The VA issued a decision on March 26, 1980, finding 30–percent disability, but denying the claim because the hand injury was not compensable; the head injury claim was denied because the injury was not identified during plaintiff's last physical examination in 1971. Plaintiff reopened his disability claim with the VA in 1980, seeking compensation for a skin condition allegedly due to exposure to Agent Orange. He later amended his claim to include an eye condition and a personality disorder, currently referred to as "Post-traumatic Stress Disorder" ("PTSD").

In late 1980 plaintiff was hospitalized for approximately two months with a psychiatric disorder diagnosed as schizophrenia. On February 3, 1981, on a VA Income Net Worth and Employment Statement (in support of his claim for total disability benefits), plaintiff stated that he was 100 percent disabled as of March 10, 1979, his last day of work. It is noteworthy that the date plaintiff alleges to be the date of total disability falls only one day before the automobile accident of March 11, 1979, in which plaintiff suffered a severe head injury and after which he complained of memory problems and irritability.

On July 30, 1981 the VA issued another rating decision denying plaintiff benefits for PTSD. The decision observed that plaintiff's records revealed no eye problems or skin condition during active duty and that plaintiff suffered before, during, and after his service from psychiatric disorders, including depression, suicidal tendencies, and schizophrenia.

Plaintiff filed a Notice of Disagreement, the first step in appealing the VA rating decision to the Board of Veterans Appeals, on August 24, 1981. Upon reconsideration of plaintiff's claim for disability benefits, the VA confirmed the July 1981 rating on September 3, 1981. In December 1981 the VA deferred its rating decision upon plaintiff's request for a complete review of his medical records. After considering plaintiff's clinical records in their entirety, the VA issued a third and final rating decision on January 8, 1982, denying plaintiff disability benefits for PTSD.

In two separate rating decisions (1981 and 1982), the VA denied service connection for plaintiff's personality disorder and delayed stress syndrome claims. The VA disallowed the personality disorder claim because it pertained to a constitutional or developmental abnormality, for which benefits are not available, and because plaintiff failed to establish a service connection.

The PTSD claim was denied because the medical findings attributed that claim to plaintiff's personality disorder—an inadequate personality. The VA regulations state that congenital or developmental defects or personality disorders, characterized by developmental defects, are not diseases or injuries within the meaning of the legislation applicable to service connection. 38 C.F.R. 3.303(c) (1990). Despite plaintiff's February 1981 diagnosis of "paranoid schizophrenic with depression," a later VA examination found no disabling psychosis present, but it did diagnose plaintiff with an "emotionally unstable personality." Due to the lack of an established service connection, the schizophrenia claim was denied, as well.

In accordance with proper procedures, the VA issued a Statement of the Case on September 8, 1981. Later that month, plaintiff filed a formal appeal to the Board of Veterans Appeals, seeking a rating of only 25–percent disability service-connected for delayed stress. The Board of Veterans Appeals established a service connection for plaintiff's PTSD on August 30, 1983. Upon remand and review of plaintiff's entire clinical records, the Board found plaintiff totally disabled since his initial claim for consideration of service connection for the psychiatric disorder in November 1980.

Plaintiff next filed an application in 1986 with the Army Board for Correction of Military Records (the "ABCMR") pursuant to 10 U.S.C.A. § 1552(a) (West Supp.1990), to correct his service records to reflect a "Medical Discharge," rather than the "Honorable Discharge" that he had received. Plaintiff did not specify on this application the degree to which he claimed disability upon discharge, nor did plaintiff request placement on the Temporary Disability Retirement List ("TDRL") pursuant to 10 U.S.C. § 1202 (1988). Plaintiff also failed to request a specific rating from the ABCMR. Under this correction of records procedure, a member of the armed forces, who is entitled to basic pay but who fails to qualify for retirement because his disability has not been determined permanent, can be placed on the TDRL with retired pay if the Secretary of the appropriate military

department determines that the disability may be permanent. After five years on the TDRL, the disability (if the same disability still exists) is considered permanent. 10 U.S.C. § 1210(b). Further, a determination of at least 30–percent disability under the VA disability rating standards, in addition to a permanent disability determination after five years, allows the service-member to be removed from the TDRL and retired. 10 U.S.C.A. § 1210(c) (West Supp. 1990).

Plaintiff presented the ABCMR with post-discharge evidence, including his job history profile (1971–1980), his earnings record, the Social Security award of total disability for PTSD, and his medical reports from 1980 to present. The Itemized Statement of Earnings indicates that plaintiff held 54 different jobs from 1968–1980. Despite employment income from 1971–1979, plaintiff received virtually no wages from 1980 to present. Although plaintiff contends that the Social Security Administration awarded him a 100–percent disability rating for PTSD in March 1981, the earliest date possible, plaintiff failed to include the basis for this assertion in the appendix to his brief.

The medical evidence submitted by plaintiff is the most direct evidence of PTSD. The VA records indicate plaintiff was hospitalized on no less than 10 separate occasions from 1980–1988. Although the length of the hospitalizations varies from a few days to two months, the reasons for plaintiff's admissions and the subsequent diagnosis are the same: depression, insomnia, and loss of appetite all stemming from PTSD, personality disorder, drug abuse, and chronic alcoholism. The clinical records submitted by plaintiff show his first VA psychiatric admission in 1980 in Wichita, Kansas. The only other hospital stay in Wichita occurred in 1979 after the automobile accident that rendered plaintiff unconscious for several days. The remainder of the medical records that plaintiff submitted, although incomplete, show periods of hospitalization in the VA Hospital in Topeka, Kansas: one from May 1984 through February 1985, as well as seven

days during the course of 1988. The records also indicate that the May 1984 admission was plaintiff's second Topeka admission and his eighth VA psychiatric admission. Although the VA determined in 1985 that plaintiff was able to resume employment upon discharge, the 1988 reports note that he was discharged "irregular" after his first 1988 VA hospitalization. Medical records from the seven different 1988 hospitalizations diagnose plaintiff as suffering from PTSD, inadequate personality, and organic brain damage, possibly secondary to trauma from the 1979 automobile accident. Additional reports illustrate plaintiff's abuse of drugs and alcohol.

In its decision the ABCMR relied on advisory opinions from the Office of Army Surgeon General and from the Physical Evaluation Board ("PEB") of the Army Physical Disability Agency. The Surgeon General's advisory opinion indicated that plaintiff was "questionably medically qualified for retention at the time he was separated [from the service]" and that it remained unclear how much medical care he received for psychiatric symptoms during the years after his military service, since plaintiff was not eligible for VA care until approximately 1980.

The PEB's advisory opinion suggested 1) that despite the 1971 separation examination finding him fit for duty, plaintiff's records should be changed to reflect his placement on the TDRL for five years in lieu of discharge; 2) that plaintiff's condition would have been found to be unchanged from 1971 to 1976; and 3) that plaintiff's 30–percent disability based on PTSD would have been permanent in March 1976.

The Surgeon General's advisory opinion, in one page, briefly describes plaintiff's meritorious service in combat, AWOL episodes, hospitalization for depression and suicidal tendencies in 1969, and the qualifying separation examination in 1971. Although the advisory opinion states that the amount of plaintiff's psychiatric treatment from 1971–1980 is "unclear," it acknowledges his severe head injury from the automobile accident and his ensuing numerous

hospitalizations for psychiatric treatment. Finally, the opinion mentions the Board of Veterans Appeals award of service-connected psychiatric disorder disability (later made 100 percent retroactive to November 18, 1980) and formally states that plaintiff was "questionably" medically qualified for service at the time of separation. The two-page PEB advisory opinion similarly describes in cursory fashion the significant dates and events of plaintiff's service. The "discussion" on page 1 of the opinion is comprised of six statements, only one of which discusses plaintiff's mental condition as the probable cause of his AWOL episodes.

Based on the advisory opinions, the ABCMR found that plaintiff was unfit at the time of his discharge from active duty and that plaintiff's administrative separation was improper. The ABCMR concluded that the Army's failure to properly evaluate plaintiff's physical condition upon separation from the service was in error and unjust. The ABCMR recommended that plaintiff's records be corrected to show: 1) that plaintiff was unfit for duty on March 17, 1971, when he was relieved from active duty for physical disability at a rating of 30 percent and, on the following day, that he was placed on the TDRL with entitlement to retired pay in the highest grade of PFC; and 2) that plaintiff's disabilities were permanent on March 17, 1976, and that he was retired permanently on March 18, 1976, and thus removed from the TDRL and permanently retired with grade pay of PFC. The ABCMR's recommendations were approved on May 17, 1989.

On July 21, 1989, plaintiff requested reconsideration of the ABCMR's decision asserting for the first time that he was totally disabled at the time of separation, contrary to the ABCMR's recommendation that plaintiff's disability rating be 30 percent. At this time plaintiff submitted additional evidence in support of his claim for 100–percent disability.

On October 6, 1989, the ABCMR denied plaintiff's request for reconsideration on the basis that the ABCMR previously had considered the original application and that

the additional material submitted by plaintiff was not so substantial and material as reasonably to provide a basis for reversal of the ABCMR's original decision. Plaintiff filed suit in this court on March 15, 1990.

After argument and upon a written opinion, the court remanded the case to the ABCMR on February 20, 1991, with the following directions:

Plaintiff has shown by cogent and clearly convincing evidence that the decision of the ABCMR failed to reflect a balancing of the conflicting evidence concerning his medical condition prior to, during, and post-discharge and to identify the criteria used as a basis for its decision. The military must put its own mind to the task in a close case and must explain the reasoning underlying its conclusion. Accordingly, based on the foregoing,

IT IS ORDERED, as follows:

1. ....

2. The ABCMR will thoroughly review the available evidence to determine the extent of plaintiff's disability at the date of discharge and 5 years from that date. Specifically, the ABCMR's decision shall analyze the medical evidence of record, especially the conflicting evidence, prior to, during, and post-discharge, and shall indicate what criteria were used in determining the extent of plaintiff's disability as of 1971 and 1976. In furtherance of this mandate, the ABCMR shall conduct such further proceedings if and as the ABCMR deems proper.

*Walden*, 22 Cl.Ct. at 540.

In connection with the remand, plaintiff submitted an April 1, 1991 affidavit to the ABCMR. On July 15, 1991, the ABCMR issued its Memorandum of Consideration responding to the court's mandate. The ABCMR incorporated by reference a June 21, 1991 advisory opinion from the Army Physical Disability Agency. The following recommended findings of the Physical Disability Agency are pertinent to plaintiff's contentions on the pending cross-motions:

2.c. On January 14, 1969, plaintiff received Article 15 punishment for an episode of being absent without leave ("AWOL") and for being drunk in command. On January 29, 1969, during a period of hospitalization for a lacerated hand, plaintiff was given a psychiatric consultation and was diagnosed with "chronic mild depression with suicidal ideas under combat conditions." Found "actively suicidal" when surrounded by death and killing, plaintiff was restricted from combat duty; however, the psychiatric department judged plaintiff to be medically fit to return to duty, as restricted.

....

2.i. In late 1980 plaintiff was hospitalized for approximately two months with a psychiatric disorder diagnosed as schizophrenia. On February 3, 1981, on a VA Income Net Worth and Employment Statement (in support of his claim for total disability benefits), plaintiff stated that he was 100 percent disabled as of March 10, 1979, his last day of work. It is noteworthy that the date plaintiff alleges to be the date of total disability falls only one day before the automobile accident of March 11, 1979, in which plaintiff suffered a severe head injury and after which he complained of memory problems and irritability.

2.j. On July 30, 1981, the VA issued another rating decision denying plaintiff benefits for PTSD. The decision observed that plaintiff's records revealed no eye problems or skin condition during active duty and that plaintiff suffered before, during, and after his service from psychiatric disorders, including depression, suicidal tendencies and schizophrenia.

2.k. Plaintiff filed a Notice of Disagreement, the first step in appealing the VA rating decision to the Board of Veterans Appeals, on August 24, 1981. Upon reconsideration of plaintiff's claim for disability benefits, the VA confirmed the July 1981 rating on September 3, 1981. In December 1981 the VA deferred its rating decision upon plaintiff's request for a complete review of his medical

records. After considering plaintiff's clinical records in their entirety, the VA issued a third and final rating decision on January 8, 1982, denying plaintiff disability benefits for PTSD.

. . . .

2.s. The Surgeon General's advisory opinion, in one page, briefly describes plaintiff's meritorious service in combat, AWOL episodes, hospitalization for depression and suicidal tendencies in 1969, and the qualifying separation examination in 1971. Although the advisory opinion states that the amount of plaintiff's psychiatric treatment from 1971–1980 is "unclear," it acknowledges his severe head injury from the automobile accident and his ensuing numerous hospitalizations for psychiatric treatment. Finally, the opinion mentions the Board of Veterans Appeals award of service-connected psychiatric disorder disability (later made 100 percent retroactive to November 18, 1980) and formally states that plaintiff was "questionably" medically qualified for service at the time of separation. The two page PEB advisory opinion similarly describes the significant dates and events of plaintiff's service. The discussion suggests plaintiff's mental condition as the probable cause of his AWOL episodes.

. . . .

3.e. The Agency, having concluded that the applicant's career was interrupted because of his psychiatric disorder and that he was ratable at the thirty percent (30%) level, then turned to the question of the permanency of the disability. We concluded that the applicant's condition may not be permanent. To protect both the interests of the applicant and the U.S. Army, the Physical Evaluation Board (PEB), in a decision adopted by the Agency, recommended placing the applicant on the Temporary Disability Retirement List (TDRL). Unfortunately, contrary to the usual practice, no periodic medical examination, which could assess the applicant's mental condition periodically over the subsequent five (5) year time-period from 1971 to 1976, could be obtained because the recommended placement on the TDRL did not occur until 1989. Since disability statutes compel a final decision at the five (5) year point and, in the absence of any medical or other evidence to show that the applicant's condition had significantly changed from its initial thirty percent (30%) rating, the Agency recommended permanent retirement at the thirty percent (30%) level. This recommendation was compelled because the evidence from 1971 to 1976 shows that the applicant was employed between 1971 and 1976, albeit with a lack of job-stability. After divorcing his first wife, the applicant was able to form a social relationship with his second wife, father a child and assist in his daughter's rearing. The applicant was, for virtually all of this time-period (1971–76) married, not taking any medication(s), had no hospitalizations, was not psychotic, and appeared to be able to function, in the civilian community without involvement with law enforcement officials in any matter stemming from his mental disorder.

3.f. We now turn to the question of why the applicant cannot be rated at the one hundred percent (100%) level from 1971 to 1976. First, under the facts in this case, the U.S. Army's responsibility for this applicant ended in 1976, when his case had to be decided with finality. The evidence makes it clear that, in 1979, the applicant suffered from a traumatic as well as substantial head-injury which rendered him comatose for most of his approximately one (1) month hospitalization and which precluded his employment beginning on 11 Mar 79, the day of his automobile accident. As discussed earlier, the only rating evidence which we can consider is the evidence pertaining to the time-period of 1971–76. The record is virtually devoid of any information pertaining to the applicant for this period time (1971–1976). The only real medical information provided by medical authorities (e.g. VA etc.) is subsequent to his automobile accident of 11 Mar 79 for which the Army has no responsibility.

. . . .

3.j.  In his affidavit of 1 Apr 1991, the applicant relates an extensive history of medical problems and treatment which occurred during his period of active duty. In paragraph 12 of that affidavit, the applicant admits not disclosing pertinent information pertaining to his medical history and current condition because, he stated: "I was afraid I would be rehospitalized and not let out." The applicant appears to have taken the position that he was not going to assist the Army in accurately assessing and evaluating his medical condition because to do so may have yielded a result the applicant was not seeking. He does, nevertheless, complain that he was not properly advised of the options available in his situation. This Agency believes that the physician conducting the applicant's 25 Jan 71 separation physical examination could not obtain a sufficiently accurate medical history from the applicant upon which to base a preliminary inquiry into his mental status at that time (1971). The applicant states that he knew the (separation examination) physician "... didn't write down anything (about the applicant's hospitalization or treatment(s) for his psychiatric problems which began in Vietnam) on the physical exam paper." Armed with this knowledge, the applicant made the decision not to disclose pertinent information to the physician conducting his separation physical examination on 25 Jan 71 which would have compelled a Medical Board. Now this Agency is being asked to accurately assess the applicant's disability rating-level for the 1971–76 time-period. Our only evidence pertaining to the applicant's ability to function from 1971 to 1976 is that which the applicant has elected to provide us. Absent is any record of medical treatment(s), medication(s), record(s) of involvement (because of mental reasons) with law-enforcement personnel, social and family interactions, comprehensive employment records, records of school attendance(s), or other indicators of the effect the applicant's medical disability had on his ability to function in the civilian community. In these circumstances, an accurate rating of the applicant's 1971–76 condition is extremely difficult.

3.k.  The applicant tells us that in 1972 alone he worked at 11 different jobs earning only $940.00 for the *entire* year. He states that between 1973 and 1974, he worked at 18 different jobs. We know that for at least some of this time-period, the applicant was a professional truck driver. We do not know why he could not perform this essentially solitary job because of his mental condition. Employment instability alone is insufficient evidence of psychosis to justify any rating. There must be some nexus between the mental disorder of the applicant and his impairment in the civilian community. An effort to relate ratings from 1980 back to 1971–1976 appears to stretch this nexus. The applicant does not tell us what he was doing, why he could no longer do it, or how (as we know from other information in his file) he successfully formed a marital-relationship, married and raised a child. No employer[s'] names or addresses were provided to us so that we might be able to ascertain the reason for the applicant's departure from any employment. We do not know if he was inept, if his employer had no more work for him, or, indeed, if the applicant merely no longer liked the type of work he was doing. The applicant has, furthermore, provided no indication as to how he was financially able to marry and raise his child. We do know that the applicant was a professional truck driver in 1975 and earned $7000.00; therefore, in 1975, the applicant appears to have made an adequate adjustment to his disorder. However, in the absence of the requisite evidence, we must conclude that, from 1971 to 1976, the applicant's condition did not appreciably change. There is no evidence that the applicant's medical condition became worse during that time-period. The first significant change in the applicant's condition occurred following his 11 Mar 79 automobile accident; however, the Army is not responsible for the applicant's condition after 1976 and may not evaluate the ap-

plicant's level of disability based upon an obviously aggravating event approximately three years after the Army's responsibility for the applicant ended. Because the Army's obligation to the applicant ended in 1976, the Social Security and VA evaluations based on medical and other evidence beyond that date do not provide sufficient evidence about the applicant's condition from 1971 to 1976 to rate it any higher than initially rated in 1971.

(Emphasis in original.) The ABCMR itself made the following findings:

1. The question of whether the applicant had a history of pre-service psychiatric illness was never raised nor addressed during the initial review of his case and, therefore, had no bearing on the Board's decision to recommend a 30 percent disability rating vice a 100 percent rating. Consequently, the Board does not consider this question to be an issue at this time. There is a presumption that an individual is fit when accepted into military service.

2. As indicated by the USAPDA in the attached endorsement, for the Board to have recommended rating the applicant's disability at 100 percent, the evidence available to the Board would have had to indicate that he was "virtually isolated in the community, had incapacitating psychoneurotic symptoms bordering on gross repudiation of reality with disturbed thought and behavioral processes associated with almost all daily activities and was demonstrably unable to obtain or retain employment."

3. Again, as pointed out by the USAPDA, indicators that a person is 100 percent (totally) psychiatrically disabled suggest that the person: is usually mentally incompetent to handle financial affairs; is usually hospitalized; is actively psychotic; requires constant supervision; has a significant potential to be harmful to self or others; is unemployed; and is incapable of any social adjustment.

4. To date, the applicant has submitted insufficient evidence for the Board to conclude that he was 100 percent disabled either in 1971 when he was discharged or in 1976 when, as the records were previously corrected, he was removed from the TDRL and permanently retired, rated 30 percent disabled.

5. Other than the VA records which amply document his psychiatric condition from 1980, the applicant has submitted scant evidence to support his claims of failed relationships and inability to keep a job for any length of time or to be gainfully employed.

6. There are no medical records from 1971 through 1976 or any other records or documentation which portray the applicant as being totally psychiatrically disabled from the date of his discharge from the Army. The absence of such records or documentation weakens the applicant's case, since the Board cannot merely presume that his condition during that period was the same as reflected in the medical evidence generated from 1980 to the present.

7. Consequently, having recommended the applicant's placement on the TDRL at 30 percent and with no definitive medical evidence indicating a change in his condition during his 5-year tenure on the TDRL, the Board had no other alternative, but to recommend his permanent retirement at the 30 percent disability rate. Any increase in the severity of his condition following his permanent retirement did not and does not mandate any action by the Department of the Army.

8. As indicated by The Surgeon General in his opinion in this case on 26 August 1988, consideration was given to the 100 percent rating given by the VA. However, the fact that the VA and the Army are separate agencies and that neither is bound by the decisions of the other is an important point to be made. Also, each uses a different concept when assigning ratings. The VA, operating under its own policies and regulations, may assign a rating and award compensation solely on the basis of the existence of a service connected medical condition. To the extent that a medical condition exists which reduces or impairs the social or industrial adaptability of the individual concerned,

the VA may change, i.e., increase or decrease its rating. It is not required, as the Army is, to determine an individual's fitness to perform his military duties at the time of separation. Consequently, a specific rating by the VA, 12 to 15 years after the fact, as in this case, does not compel the same rating by the Army.

9. Likewise, neither does a "100 percent" Social Security Administration Award from 1981 establish a basis for concluding that his disability should have been rated at 100 percent either in 1971 or 1976.

10. In view of the foregoing the Board finds no basis for changing its original recommendation in this case.

After the ABCMR's decision on remand was transmitted to the court, the parties agreed to a schedule for briefing plaintiff's objections to this decision.[2]

## DISCUSSION

The reviewing court cannot overturn a determination made by the military with respect to disability retirement absent a violation of a statute or regulation, *see Curry v. United States*, 221 Ct.Cl. 741, 746, 609 F.2d 980, 983 (1979), unless plaintiff shows " 'by cogent and clearly convincing evidence,' " that such a determination is arbitrary, capricious, or unsupported by substantial evidence. *Finn v. United States*, 212 Ct.Cl. 353, 356, 548 F.2d 340, 342 (1977) (quoting *Stephens v. United States*, 174 Ct.Cl. 365, 371–72, 358 F.2d 951, 954 (1966)). "Judicial deference to administrative decisions of fitness for duty of service members is and of right should be the norm...." *Maier v. Orr*, 754 F.2d 973, 984 (Fed.Cir.1985). Additionally, the Federal Circuit in *Heisig v. United States*, 719 F.2d 1153 (Fed.Cir.1983), stated:

It is equally settled that responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and that courts cannot substitute their judgment for that of the military departments when reasonable

minds could reach differing conclusions on the same evidence.

719 F.2d at 1156 (footnotes omitted).

In military pay matters, the court reviews a plaintiff's case "through the prism of a correction board." *Cohn v. United States*, 15 Cl.Ct. 778, 789 (1988). The scope of judicial review is narrow: To overturn the board's decision, plaintiff must prove by cogent and clearly convincing evidence (1) a material legal error or injustice in the correction board proceeding and (2) an adequate nexus between the error or injustice and his separation from service without 100–percent disability compensation. *Hary v. United States*, 223 Ct. Cl. 10, 15, 618 F.2d 704, 706 (1980). Further, plaintiff must overcome the presumption that "administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Sanders v. United States*, 219 Ct. Cl. 285, 302, 594 F.2d 804, 813 (1979) (citations omitted). Although the court might disagree with the board's decision, it cannot substitute its own judgment for that of the board if reasonable minds could reach differing resolutions of a disputed fact. *Heisig*, 719 F.2d at 1156.

Plaintiff argues that the ABCMR's conclusion, allowing only a 30–percent, rather than a total, 100–percent, disability rating for retirement benefits for PTSD is arbitrary and capricious.

On remand the ABCMR considered, through the Physical Disability Agency's review, the following: Plaintiff's ABCMR application and his affidavit, along with his military medical and personnel records, advisory opinions from the Army Surgeon General and the PEB, decisions and records from the VA and Social Security Administration, and the June 21, 1991 advisory opinion from the Physical Disability Agency. In reviewing this evidence, the Physical Disability Agency utilized AR 635–40 ¶ B107(e) (Sept. 1, 1990), to classify the level of social and industrial impairment in connection with rating an impairment due to a mental disorder:

**2.** Plaintiff waived the filing of a reply brief.

(1) *Total at 100 percent.*

    (a) Usually mentally incompetent to handl[e] financial affairs and to participate in PEB proceedings.

    (b) Usually hospitalized, rarely in care of next-of-kin or guardian.

    (c) Actively psychotic, totally out of contact with reality.

    (d) Requires constant supervision and care.

    (e) Significant potential to be harmful to self or others.

    (f) Unemployable.

    (g) Incapable of any social adjustment.

    . . . .

(4) *Definite at 30 percent.*

    (a) Does not require hospitalization.

    (b) Displays some signs or symptoms of mental illness on examination.

    (c) Usually requires medication and or psychotherapy.

    (d) Usually there is job instability.

    (e) Borderline social adjustment.

The parties agree that AR 635–40 ¶ B107(e) sets forth the applicable standards for determining plaintiff's disability rating.

▮ This court has reviewed carefully all the materials before the ABCMR, including plaintiff's recent affidavit; the advisory opinion of the Physical Disability Agency; and the ABCMR's findings and concludes that the nature and type of analysis undertaken by the ABCMR complied with the remand order.[3] Plaintiff argues, overarchingly, that the board erred by failing to consider whether the criteria for either the 50– or 70–percent disability rating applied incident to making its ultimate finding that plaintiff did not qualify for the 100–percent rating. Plaintiff first raised this argument during oral argument on remand and the court rejects it as untimely.

It is true that when plaintiff originally applied to the ABCMR he did not request, nor was he required to request, a specific rating. It is also true that in assigning plaintiff a 30–percent rating, the ABCMR in its first decision did not evaluate the

evidence under the criteria for the other three rating profiles, i.e., 50, 70, or 100 percent. No requirement exists for the correction board to do so, nor did plaintiff cite to any regulation or other directive requiring such an approach. However, this is not to say that an order of remand might not have required the ABCMR to make such an analysis.

Plaintiff's complaint charged that the ABCMR erred in failing to award him 100–percent disability and in assigning the 30–percent rating. In his original motion for summary judgment, he argued:

> To prevail, the ABCMR must show that they have proven with substantial evidence the disability is only thirty percent (30%), or "definitely" (38 C.F.R. Sec. 4.132 DC 9411) disabling. To prevail, the Plaintiff must clearly and convincingly show the ABCMR has failed to show a thirty percent (30%) disability, and by substantial evidence show a "total" or one hundred percent (100%) disability. 38 C.F.R. Sec. 4.132 DC 9411.

Plf's Br. filed Jan. 3, 1991, at 15. In his pending motion, plaintiff frames the issue as:

> Whether the decision of the Army Board for [Correction] of Military Records (ABCMR), granting Plaintiff disability benefits based upon a disability rating of only thirty percent (30%), rather than one hundred percent (100%), was arbitrary or capricious, contrary to law or regulation, or unsupported by substantial evidence.

Plf's Br. filed Oct. 9, 1991, at 2.

▮ As discussed during oral argument, the court's remand order can be read consistent with an obligation to canvass all the disability ratings for a mental disorder. To do so, however, would be inconsistent with the parties' and court's understanding after plaintiff had a full opportunity to brief and argue his best case. The parties fully concurred that the issue on remand was whether the ABCMR sufficiently evaluated the evidence before it in determining that

---

**3.** The ABCMR and Physical Disability Agency's discussion of the relationship of and differences between VA determinations and Army disability determinations was particularly thorough.

plaintiff's disability was ratable at 30 percent as opposed to 100 percent. In framing its remand order, the court sought the parties' guidance, and they submitted proposed language which the court adopted. That language must be read against the backdrop of plaintiff's position and arguments leading to the remand, which do not support what amounts to a request for further remand.[4]

Plaintiff justifiably complains that the Physical Disability Agency made several factual errors. For example, the Physical Disability Agency overstates his earnings for 1975. During 1975 plaintiff had four jobs with annual earnings of $984.00.[5] The Physical Disability Agency incorrectly stated that "the applicant was a professional truck driver in 1975 and earned $7000.00...." Moreover, the Physical Disability Agency waxes romantic when it states that plaintiff "successfully formed a marital-relationship, married and raised a child...." As defendant conceded in argument, the recommended finding derived from the fact that there was no evidence of divorce. Neither is there evidence that plaintiff participated in raising his child. The Physical Disability Agency also conjectures that "he was financially able to marry and raise his child...." The assumption of financial ability apparently is based on the fact that plaintiff paid for a marriage license. Fathering a child is an act that plaintiff correctly characterizes as a mechanical one capable of being performed without an ability to form social relationships.

The court does not discount these factual errors, but, individually or taken together, they do not detract from the substantial evidence cited by the Physical Disability Agency and adopted by the ABCMR in supporting the findings that plaintiff does not satisfy the criteria for a 100–percent rating and more closely approximates those for a 30–percent rating.[6] For example, as both the ABCMR and the Physical Disability Agency point out, no medical records were available for the critical 1971–1976 period. The 100–percent rating requires findings of "[u]sually hospitalized, rarely in the care of next-of-kin or guardian," and "requires constant supervision and care." The record contains no evidence to support such findings, even by inference. Plaintiff does not aver that he was hospitalized during this period.

Plaintiff contends: "[T]he Board still refuses to view the years 1971 thru 1976 through the lens of the treatment records from 1980 to the present." Plf's Br. filed Oct. 9, 1991, at 5. Manifestly, the ABCMR refused to do precisely this. It proceeded inductively and would not presume that plaintiff suffered from PTSD in the 1970's because plaintiff's post–1980 medical diagnoses were consistent with PTSD, which was only recognized as a medical condition in 1980. Unlike the Army's determination, that of the VA was not confined to a specific interval, such as the date of discharge and five years after the date of discharge.

Moreover, the Physical Disability Agency also noted that the first significant change in plaintiff's condition occurred following his March 11, 1979 automobile accident, which it characterized as an "aggravating event" occurring approximately 3 years after the Army's responsibility ended in 1976. Plaintiff was hospitalized for one month in a comatose condition. Plaintiff has agreed with the factual recitation in the court's earlier opinion, which describes the accident as causing plaintiff to suffer a severe head injury leading to his complaints of memory problems and irritability. *See Walden*, 22 Cl.Ct. at 534. The ABCMR

---

4. The Physical Disability Agency did set forth the criteria for all 4 ratings (30, 50, 70, and 100 percent). It is not altogether clear that the Physical Disability Agency considered only the 100– and 30–percent ratings, although the others are not discussed further.

5. Plaintiff reads the record to reflect six jobs with earnings of $1903.53. Since defendant agreed that the Physical Disability Agency made

a mistake, the court adopts the version more favorable to plaintiff.

6. The analysis of the applicable case law in *Walden*, 22 Cl.Ct. at 539–40, demonstrates that the cases relied on by plaintiff would not lead to the same result given the facts as developed on remand in this case.

was not arbitrary or capricious in finding that the 1979 automobile crash was a significant intervening event in plaintiff's medical history.

Plaintiff argues that the ABCMR ignored evidence that he was impaired from 1969 to 1971 and after the 1971 discharge. Specifically, plaintiff points out that he has held 54 jobs since 1971, none over a year and most lasting only a few weeks or months at a time. He has never earned annually more than $5,000.00 between 1971 and 1980. He has been hospitalized for his disorder approximately 20 to 25 times since 1971 (most occurring in the 1980's). By 1984 he was being medicated with the psychotropic drug Lithium Carbonate, and was in his eighth psychiatric hospitalization following his discharge in 1971. Between his 1971 discharge and 1988, he had attempted suicide two more times. Plaintiff argues that his job history and symptomology are typical of veterans suffering from PTSD. Plaintiff asks either that his medical history, supported by records, from 1969 to 1971 be presumed to have continued throughout the 1970's, or that records dating from 1980 presumptively reflect an on-going condition ten years earlier, as supported by the evidence of this condition between 1969–1971.

■ The frailty in this argument is that it would nullify the regulation's requirements. Unlike the VA, the ABCMR is making a determination of a servicemember's condition at the time of discharge through five years later. From records pre- and post-dating the five-year period, plaintiff asked the board to presume that he usually was mentally incompetent to handle his financial affairs; that he was usually hospitalized, rarely in the care of a next-of-kin or guardian; that he was actively psychotic, totally out of contact with reality; that he required constant supervision and care; that he had significant potential to be harmful to himself or others; that he was unemployable; and that he was incapable of any social adjustment. Even assuming, *arguendo*, the accuracy of plaintiff's allegations, they would not supply a basis for the findings required by AR 635–40 ¶ B107(e) for a 100–percent disability rating. The court does not lightly regard plaintiff's mental disorder. The evidence before the ABCMR, however, does not satisfy the criteria for a 100–percent rating and more closely approximates those for a 30–percent rating.

The military correction boards likely will review many similar applications in the years to come. A ruling in this case in plaintiff's favor would have the result of removing from the military's discretion the decision to require medical and other types of records in making retrospective disability determinations. Moreover, such a ruling would be unfair to another servicemember who does submit, for example, medical records subsequent to his military service, but whose medical records indicate only occasional hospitalizations during the period from the date of discharge to the date on which he would have been removed from the TDRL. Ignoring the lack of records in plaintiff's case might permit him to be ratable at 100 percent; the servicemember whose medical records do exist, but are insufficient under the regulatory standards, would be denied that rating.

## CONCLUSION

Plaintiff has failed to prove by cogent and clearly convincing evidence that the decision of the ABCMR in denying him a rating of 100 percent and rating him as 30–percent disabled was arbitrary, capricious, or unsupported by substantial evidence. Accordingly, based on the foregoing, defendant's renewed motion for summary judgment is granted and plaintiff's renewed cross-motion is denied. The Clerk of the Court shall enter judgment for defendant and dismiss the complaint.

IT IS SO ORDERED.

No costs.